UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 17-CR-367 (JFB)

UNITED STATES OF AMERICA,

VERSUS

JUVENILE MALE,

Defendant.

**MEMORANDUM AND ORDER**
June 19, 2018

JOSEPH F. BIANCO, District Judge:

On July 10, 2017, the government filed a Juvenile Information against defendant Juvenile Male ("the defendant"),[1] charging him with one count of racketeering by engaging in conspiracy to murder and murder, 18 U.S.C. § 1962(c); one count of racketeering conspiracy, 18 U.S.C. § 1962(d); one count of conspiracy to murder rival gang members, 18 U.S.C. § 1959(a)(5); and four counts of murder, 18 U.S.C. §§ 2, 1959(a)(1). These charges relate to the alleged murders of Justin Llivicura, Michael Lopez, Jorge Tigre, and Jefferson Villalobos in a wooded area near the Central Islip Recreational Center in Central Islip, New York on April 11, 2017 ("the April 11 murders").

Before the Court is the government's motion under 18 U.S.C. § 5032 to transfer the case to district court in order to prosecute the defendant as an adult. On June 5, 2018, after receiving written submissions from the parties, the Court held a hearing on the motion. This Memorandum and Order contains the Court's findings under 18 U.S.C. § 5032.

After carefully analyzing the required statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that, notwithstanding the statutory presumption in favor of juvenile adjudication, the government in this case has rebutted that presumption and met its burden of proving by a preponderance of the

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. 18 U.S.C. § 5038(e). In order to comply with this provision and Section 5038's other provisions requiring the confidentiality of juvenile records, the Court determined that these proceedings and all related documents should be sealed.

evidence that the defendant's transfer to adult status is warranted. In particular, as discussed in detail below, this defendant was just two months shy of his eighteenth birthday at the time of the alleged murders, left El Salvador to avoid gang violence, had the benefit of a supportive and nurturing immediate family and extended family system (including living with his parents and two siblings on Long Island), possesses relative strengths in common sense and verbal conceptual reasoning, and showed academic success in school in El Salvador. Notwithstanding his age (being nearly eighteen years old), relatively strong academic background, and positive social influences, the defendant allegedly still chose to actively participate in these brutal, premeditated murders in connection with his involvement with an extremely violent street gang. Moreover, he is now nineteen years old and the Court concludes, based upon the entire record, that he is not likely to be rehabilitated in the juvenile justice system. Although some other factors weigh against transfer, they are greatly outweighed by these factors that support transfer to adult status.

First, the nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult. As detailed below, the defendant is charged with actively participating in four brutal murders for La Mara Salvatrucha, a violent street gang also known as MS-13. More specifically, the defendant and his co-conspirators allegedly lured the unsuspecting victims to a prearranged location in the Central Islip woods where they murdered them with machetes, knives, and tree limbs. The heinous killings were allegedly motivated by the fact that the victims were suspected members of the rival 18th Street Gang, and had falsely represented themselves as MS-13 members. A defendant who is alleged to have participated in this manner in the brutal murder of four individuals is unlikely to be rehabilitated within the juvenile justice system, especially given the limited sentencing options available in that system if the defendant were found guilty (such as the statutory maximum of five years' incarceration).[2] In short, in the Court's view, given the gravity of the alleged crimes here, this is the most critical factor in this particular analysis and is a compelling factor in favor of transfer.

Second, the defendant's age and social background also strongly favor transfer. The defendant was just two months shy of eighteen when he participated in the April 11 murders, and is now over nineteen years old. As for the defendant's social background, the defendant benefited from a supportive family and community ties, and still allegedly chose to associate with MS-13 and participate in these brutal murders. Before moving to the United States, the defendant was raised by his extended family and was an active member of his church and community. Upon arriving in Long Island, the defendant lived with his immediate family, with whom he describes having a "close" relationship. The defendant was a relatively strong student. The defendant was traumatized by a run-in with a gang in El Salvador, during which the gang killed his uncle, and which led him to flee the country. The Court finds that, given that the defendant allegedly committed the murders despite these stabilizing and deterring influences, the defendant's age and social background strongly favor transferring him to adult status.

---

[2] *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii); *see also United States v. C.F.*, 225 F. Supp. 3d 175, 191 (S.D.N.Y. 2016) ("An offender who is between ages 18 and 21 when adjudicated a juvenile delinquent may be ordered to serve up to five years in juvenile detention.").

2

Third, the defendant's lack of a juvenile record weighs against transfer, but as explained below, the Court finds that, in the instant case, after balancing all of the statutory factors (including this one), transfer is in the interest of justice.

Fourth, as for the defendant's present intellectual development and psychological maturity, the Court finds this factor to be neutral. A neuropsychological screening of the defendant revealed that his intellectual functioning was at the low average range and that he was emotionally and socially immature. On the other hand, the defendant's fairly strong academic record suggests a significantly higher level of intellectual development and maturity. Thus, on balance, this factor neither favors nor disfavors transfer.

The remaining two factors—the nature of past treatment efforts and the defendant's response to those efforts, as well as the availability of programs designed to treat the defendant's behavioral problems—weigh against transfer. There is no evidence that, before his detention in connection with this case, the defendant received any formal treatment or counseling. As noted, however, the defendant's grades and behavior during his detention over the last eleven months have been very positive. Accordingly, the Court concludes that this factor weighs slightly against transfer. As for the availability of programs designed to treat the defendant's behavioral problems, there is some indication that facilities in Pennsylvania and Maine would be available to the defendant if found guilty as a juvenile. Accordingly, this factor also weighs slightly against transfer.

In sum, although some factors weigh against transfer, they do not outweigh the other factors that, in combination, overwhelmingly favor transfer. As the Second Circuit has emphasized, "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) (quoting *United States v. J.D.*, 525 F. Supp. 101, 103 (S.D.N.Y. 1981)). The Sixth Circuit has similarly reasoned that "a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. T.F.F., A Juvenile Male*, 55 F.3d 1118, 1121 (6th Cir. 1995) (quoting *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir. 1994)). Here, after analyzing all of the factors with respect to this defendant, the Court concludes that there is no likelihood that the goals of the juvenile system will be achieved while the defendant is in juvenile custody and, under the particular circumstances of this case, "the concerns of public protection and punishment become paramount." *Nelson*, 90 F.3d at 640. In other words, the juvenile justice system is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these violent crimes when considered in conjunction with the other statutory factors.

Accordingly, after thoroughly considering and weighing the statutory factors, the Court has determined in its discretion that treating the defendant as an adult in this case will serve the interest of justice.[3]

---

[3] This decision is consistent with others in which this Court transferred juveniles to adult status for their alleged participation in violent acts for MS-13. *See generally, e.g., United States v. Juvenile Female*, No. 17-CR-362 (JFB), 2018 WL 2846558 (E.D.N.Y. June 11, 2018) (defendant was seventeen years, four months old at time of her alleged participation in the same conspiracy resulting in the brutal, premeditated

3

I. THE CHARGES[4]

The charges against the defendant stem from the government's continuing investigation into MS-13. (Gov't Mem. at 2.) Since approximately 1998, MS-13 members on Long Island have engaged in street wars with rival gangs, which have resulted in the assault and murder of MS-13 and rival gang members, their family members, and innocent bystanders. (*Id.* at 2-3.) On induction into MS-13, members agree to kill rival gang members whenever possible. (*Id.* at 4.)

The defendant, an alleged MS-13 associate, is charged in connection with the murders of four suspected 18th Street Gang members. (*Id.* at 3-4.) According to the government, the defendant was part of a conspiracy to lure the four victims to their deaths, and participated in carrying out the murders. (*Id.* at 6-8.) These murders were allegedly carried out because MS-13 suspected that the victims and a fifth individual present that night, who fled the scene ("Surviving Victim"), had falsely represented themselves to be MS-13 members. (*Id.* at 7.)

In furtherance of the conspirators' plan, on April 11, 2017, Juvenile Female 1 and Juvenile Female 2 invited Surviving Victim to smoke marijuana in a wooded area near the Central Islip Recreational Facility. (*Id.*) Surviving Victim accepted the invitation, and invited the four victims to join. (*Id.*)

Meanwhile, MS-13 members and associates waited in the wooded area and prepared for the murders. (*Id.*) The government alleges that, while waiting for Juvenile Female 1 and Juvenile Female 2 to bring the victims to their location, these individuals discussed the plan, divided up knives and machetes, and made clubs out of tree limbs. (*Id.* at 7-8.) Juvenile Female 1 and Juvenile Female 2 allegedly remained in

---

murders of the four individuals alleged in this case); *United States v. Juvenile Male*, 269 F. Supp. 3d 29 (E.D.N.Y. 2017) (defendant was sixteen years, six months old at time of alleged attempted murder of a rival gang member, and sixteen years, eleven months old at time of alleged murder of an MS-13 member suspected of cooperating with law enforcement and of being gay); *United States v. Juvenile Male*, No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was seventeen years, ten months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was sixteen years, seven months old at time of alleged attempted murder of a sixteen-year-old male, and seventeen years, eight months old at time of alleged murder of another individual); *United States v. Juvenile Male*, No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was seventeen years, four months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, 844 F. Supp. 2d 333 (E.D.N.Y. 2012) (defendant was sixteen years, three months old at time of alleged murder of a fifteen-year-old); *United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27 (E.D.N.Y. 2011) (defendant was sixteen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son); *United States v. Juvenile Male*, 844 F. Supp. 2d 312 (E.D.N.Y. 2011) (defendant was seventeen years, six months old at time of two alleged attempted murders); *United States v. Juvenile Male*, 754 F. Supp. 2d 569 (E.D.N.Y. 2010) (defendant was seventeen years, eight months old at time of alleged premeditated murder of nineteen-year-old woman and her two-year-old son).

[4] The allegations set forth herein are drawn from the government's motion papers. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

contact with MS-13 members in the woods, and provided them with intermittent location updates. (*Id.* at 8.)

Shortly after Juvenile Female 1 and Juvenile Female 2 arrived at the predetermined location with Surviving Victim and the four victims, MS-13 members and associates divided into groups, surrounded the victims, and ordered them to get on the ground and not move. (*Id.*) Surviving Victim immediately ran away and escaped, but the defendant and other co-conspirators hacked and beat the four victims to death using the machetes, knives, and tree limbs. (*Id.*)

According to the government, MS-13 members and associates then dragged the victims' bodies a short distance and fled, concerned that Surviving Victim would alert the police to their location. (*Id.*) They allegedly planned to bury the bodies the following night. (*Id.*) Before they could do so, the Suffolk County Police Department discovered the bodies. (*Id.*)

The government filed a sealed Juvenile Information charging the defendant in connection with the April 11 murders on July 10, 2017. (*Id.* at 3.)[5] The defendant was arraigned on July 13, 2017. (ECF No. 6.)

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson* (*Nelson I*), 68 F.3d 583, 588 (2d Cir. 1995) (quoting 18 U.S.C. § 5032).[6] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the alleged offenses; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavioral problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See, e.g., Nelson I*, 68 F.3d at 588; *United States v. Doe*, 49 F.3d 859, 868 (2d Cir. 1995).

---

[5] Other alleged MS-13 members and associates have been indicted or charged in sealed Juvenile Informations in connection with the April 11 murders in federal court in the Eastern District of New York. (Gov't Mem. at 8-9.)

[6] In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the then-acting United States Attorney for the Eastern District of New York, acting pursuant to the authority delegated to her by the Attorney General, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial Federal interest in the case and the offenses to warrant the exercise of Federal jurisdiction." (ECF No. 2.)

Although the Court must evaluate each factor identified in Section 5032, it need not afford each factor equal weight, and "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing th[at] factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder." *Id.*

In weighing the factors "the district court must keep in mind that 'permeating the transfer decision and the six-factor inquiry is the notion of rehabilitation.'" *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002) (quoting *United States v. Nelson* (*Nelson II*), 90 F.3d 636, 640 (2d Cir. 1996)). Indeed, "[r]ehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions," *Nelson II*, 90 F.3d at 640 (quoting *Nelson I*, 68 F.3d at 590), and "the statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential," *id.*

Even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," that potential "must be balanced against 'the threat to society posed by juvenile crime.'" *Id.* (quoting *United States v. J.D.*, 525 F. Supp. 101, 103 (S.D.N.Y. 1981)). Accordingly, a "glimmer of hope" for a juvenile's future treatment prospects is insufficient to prevent transfer. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640.

III. ANALYSIS OF FACTORS

A. Age and Social Background

1. Age

The Second Circuit has instructed that a district court should consider a juvenile defendant's age both at the time of the alleged offense and at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court correctly considered juvenile's age at the time of the offense, but erred in not also considering juvenile's age at the time of the transfer hearing). As for the juvenile defendant's age at the time of the alleged offense, "a crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." *United States v. C.F.*, 225 F. Supp. 3d 175, 184 (S.D.N.Y. 2016) (citing *Doe*, 49 F.3d at 867). The juvenile defendant's age at the time of the transfer hearing "is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate," considering the older a juvenile defendant is "the harder it becomes to reform the juvenile's values and behavior." *Nelson I*, 68 F.3d at 589 (citations omitted). Accordingly, the older a juvenile defendant is both at the time of the alleged offense and at the time of the transfer hearing, the more the juvenile defendant's age weighs in favor of transfer. *See, e.g., C.F.*, 225 F. Supp. 3d at 184; *United States v. A.O.*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597, at *5 (S.D.N.Y. Aug. 8, 2016) (collecting cases); *United States v. Doe*, 145 F. Supp. 3d 167, 183 (E.D.N.Y. 2015) (collecting cases).

Here, the defendant was just two months shy of eighteen when he participated in the

April 11 murders, and over nineteen years old at the time of the transfer hearing. (Gov't Mem. at 3-4.) Accordingly, the defendant's age at the time of the charged conduct and at the time of the hearing both favor transfer. *See, e.g., United States v. Sealed Defendant 1*, 563 F. App'x 91, 92 (2d Cir. 2014) (affirming transfer where, among other things, juvenile defendant "was just three months shy of his eighteenth birthday when he allegedly committed the offense and twenty years old at the time of the transfer hearing"); *Doe*, 145 F. Supp. 3d at 183 (finding the defendant's age "weigh[ed] heavily in favor of transfer" where he was months away from eighteen years old at time of offense and over the age of eighteen at time of transfer hearing); *United States v. H.V.T.*, No. 96-cr-244 (RSP) (GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) (finding juvenile's age favored transfer where he was one month shy of eighteen years old at the time of the alleged conduct and nineteen years old at the time of the transfer hearing).

2. Social Background

The Court must also consider the defendant's social background to the extent that background is indicative of his potential for rehabilitation if adjudicated as a juvenile. As explained below, under the circumstances of this case, the Court finds that the defendant's social background suggests a low likelihood of successful rehabilitation if the defendant were adjudicated as a juvenile. Accordingly, the Court finds that this factor weighs in favor of transfer.

In this case, the defendant was living with his parents and two siblings[7] in a home on Long Island, New York at the time of the murders. (Gov't Mem. at 14 (citing Pretrial Services Report at 1).) The defendant spent most of his life in El Salvador, where he was raised primarily by extended family, and moved to the United States at age seventeen, less than a year before the murders. (*Id.*; Alfonso Rep. at 2-3.) The defendant has described his relationship with his family as close, and has no reported history of mental illness, health issues, or drug use, aside from experimenting with marijuana. (Gov't Mem. at 14.)

The defendant was born in El Salvador in 1999 to parents who were unmarried at the time, but were "committed to the relationship and their son." (Alfonso Rep. at 2.) The defendant's father illegally immigrated to the United States when the defendant was several months old, and received Temporary Protected Status when the defendant was two years old. (*Id.*) The defendant's mother followed when the defendant was four years old, leaving the defendant with his great-grandmother, aunts, uncles, and other family members. (*Id.* at 2-3.)

The defendant grew up in El Salvador in a community of subsistence farmers of approximately 100 families. (*Id.* at 3.) The defendant and his extended family lived in a one-story, one-room house with a dirt floor and no indoor plumbing. (*Id.*) The defendant was an active member of his church and choir. (*Id.*) He was described as an "obedient, respectful child who loved to sing and play soccer." (*Id.*) He attended school in El Salvador from age four until he immigrated to the United States. (*Id.*) He "never identified with academics," but was always encouraged to attend school and was a "fairly good" student, receiving As and Bs in his classes. (*Id.*) The defendant believed that he would pursue "a future in the trades."

---

[7] The defendant's siblings were both born in the United States. (Biopsychosocial Report by Licensed Clinical Social Worker ("LCSW") Cecilia Alfonso ("Alfonso Rep.") at 3.)

(*Id.*)

The defendant met his father when he was ten years old, when his father visited El Salvador for the first time since leaving. (*Id.* at 7.) During this visit, the defendant's father tried, unsuccessfully, to convince the defendant to move to the United States. (*Id.*) Although the defendant's parents invited him to move several times, the defendant was convinced only after a gang murdered his uncle, when the defendant was sixteen years old. (*Id.* at 4, 7.) The defendant's uncle was only four years older and treated him like a brother. (*Id.* at 2.) The defendant and his uncle had been traveling together when a gang stopped their bus, pulled his uncle and several other people off, and shot them. (*Id.* at 4; Neuropsychological Screening by Dr. Leo J. Shea ("Shea Rep.") at 2.) After this traumatic event, the defendant feared that gang members would come back and kill him, and asked his parents to bring him to the United States. (Alfonso Rep. at 4.)

The defendant's family paid between $5,000 and $6,000 for the defendant to be smuggled into the United States. (*Id.*) The group the defendant traveled with included MS-13 members, so the defendant tried to be "as friendly and non-confront[ational] as possible." (*Id.*) Once in the United States, the defendant moved in with his immediate family on Long Island, and began attending Central Islip High School. (*Id.* at 4.) He found the school—with a student body of over 2,000 students—to be overwhelming, and received Cs and Ds in his tenth grade classes. (*Id.*) The defendant does not speak English and is "not familiar with American customs, expectations, [and] assumptions"; he was "overwhelmed and confused upon arrival," but "kept his fears and concerns to himself." (*Id.* at 7.) He learned that some of his peers were gang members, and attempted to "be social while maintaining a low profile." (*Id.* at 4-5.) He consciously indicated that he was not suited for gang membership. (*Id.* at 5.)

The defendant lived in the United States for a little over a year before his arrest. (*Id.* at 7.) During this time, the defendant helped his parents by taking care of his younger siblings and doing housework, while also working as a dishwasher at a local restaurant. (*Id.* at 3.) The defendant was consistently described as "passive . . . rather shy, self-effacing, and not emotive," and his father described him as "compliant, obedient and caring at home." (*Id.*) The defendant began smoking marijuana and drinking alcohol when he moved to the United States. (*Id.* at 6.) He found this helped him cope with the anxiety he developed after seeing his uncle murdered. (*Id.*) He smoked approximately three times a week, and was a "weekend drinker." (*Id.*)

Currently, the defendant is enrolled in the Sojourn High School of the Essex County Juvenile Detention Center ("ECJDC"). (*Id.* at 4.) He is receiving As and Bs, and his behavior while in detention has been described as cooperative and respectful. (*Id.*)

The Court finds that the defendant's social background, taken in its entirety, suggests a low likelihood of rehabilitation within the short period of time before his release if convicted as a juvenile.[8] As the government argues, the defendant "does not suffer from any conditions or addictions that could explain his participation in the plot to kill five rival gang members and the murder

---

[8] The government asserts that, according to the Bureau of Prisons, the defendant would be transferred to an adult facility when he turned twenty-one if he were found guilty of the charged offenses as a juvenile. (Gov't Mem. at 20.) Even assuming that the defendant could remain in a juvenile detention facility for the five-year statutory maximum, the Court finds that it is unlikely that the defendant would successfully rehabilitate in that time.

of four young men." (Gov't Mem. at 14-15.) The Court agrees. According to the biopsychosocial report LCSW Alfonso completed for the defense, the defendant "belonged to a supportive and nurturing immediate and extended family system." (Alfonso Rep. at 7.) The defendant was a "fairly good" student, was an active member of his church and choir growing up in El Salvador, and, while living in the United States, was employed outside of school. In addition to growing up with family support and community ties, the defendant claims to have learned to keep a low profile to avoid involvement with gangs, especially after the loss he experienced when gang members killed his uncle. Despite all of these positive social influences that should have kept him from gang involvement, the defendant still associated with MS-13 and allegedly participated in the April 11 murders.

Defense counsel submitted reports suggesting that factors other than family—in particular, the new environment in the United States and the defendant's passive nature—contributed to his decision to associate with MS-13, and argues that these, along with the defendant's personal losses (of his uncle and other family members), should weigh against transfer. (Def. Mem. at 6.) As context for the conclusions in her report, LCSW Alfonso described the unfamiliar environment in the United States, where the defendant "live[d] with parents he had never lived with, two younger siblings he did not really know, and enter[ed] an educational environment that was overwhelming, all the while having to decipher who of his peers were or were not gang members." (Alfonso Rep. at 8.) Similarly, Dr. Leo Shea wrote in a neuropsychological screening for the defense that, "[h]aving arrived in the US only 18 months ago, [the defendant] has had little opportunity to ac[c]limatize himself to the cultural norms and social mores . . . [and] has been largely relegated to an El Salvadorian community in diaspora which replicates its native cultural norms as a protective defense." (Shea Rep. at 5.) Dr. Shea echoed characterizations of the defendant as passive, and concluded that his "malleable nature and lack of understanding of US society could make him vulnerable to manipulation by peers . . . . However, it is unlikely that he would purposefully join a group that would foster and popularize the very type of trauma that threatened his life and killed his uncle." (*Id.*)

The Court has considered all of these factors and finds, overall, a low likelihood of rehabilitation where the defendant spent his entire life in a supportive family environment, had community ties, and yet allegedly still chose to participate in the four brutal murders charged in the instant case. *See United States v. Robinson*, 404 F.3d 850, 859 (4th Cir. 2005) ("Although Robinson's early years with his mother were not pleasant . . . , Robinson had been provided with a loving home for eight years prior to committing the crimes in question. We believe this factor weighed in favor of a transfer."); *United States v. Juvenile Male*, 269 F. Supp. 3d 29, 39 (E.D.N.Y. 2017) ("[T]he Court finds that, although there is no indication that the defendant's family condoned or accepted criminal activity, the defendant did not personally experience any abuse of any kind, and, despite his experience resulting from knowledge of the sexual assault of his mother, he had a stable family life both during his years in El Salvador and his years in the United States, the defendant chose to be a member of and a leader in MS-13."); *United States v. Juvenile Male*, 844 F. Supp. 2d 333, 340 (E.D.N.Y. 2012) ("[D]espite the defendant's stable, loving home life and his mother's efforts to prevent him from engaging in criminal activity, the defendant nevertheless allegedly chose to join a gang. . . . Although defendant indicated . . . that he would like to remove

himself from past gang associations, take college courses, and develop a career, the Court finds that the defendant's background indicates that it is highly unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged."). The Court recognizes that the defendant experienced tragic personal loss as well as social disruption in moving to the United States, but does not find that these or other factors (such as his marijuana use and weekend drinking) outweigh the stabilizing forces that were already present in the defendant's life that should have kept him from associating with MS-13.[9]

For all of these reasons, the Court finds that this factor weighs in favor of transfer. Further, even if the Court were persuaded that the defendant's difficulty acclimating to his new environment or his passive nature in part drove his participation in the April 11 murders, and that he could learn better mechanisms for avoiding gang participation, the Court still would not find this factor meaningfully weighs against transfer. As discussed *infra*, the nature of the alleged offenses is such that it would substantially outweigh a finding that the defendant's social background was mixed in deciding whether to transfer him to adult status.

B. Nature of the Alleged Offenses

As an initial matter, the Court notes that, in considering this factor, it must assume the juvenile defendant committed the offenses

---

[9] The Court recognizes that, in other cases, a juvenile defendant's lack of stability in his or her social background has weighed in favor of transfer. *See, e.g., Doe*, 49 F.3d at 867 (affirming district court's conclusion that social background weighed in favor of transfer where, among other things, defendant's mother lived in Vietnam, his father had petitioned a family court for judicial supervision of defendant, and "by the time of the offenses charged . . . [defendant] was completely estranged from his father, preferring the violent BTK gang over his biological family"); *A.O.*, 2016 WL 4197597, at *6 (finding social background weighed in favor of transfer where juvenile defendant "was subject to abuse, neglect, and episodes of abandonment" and "ha[d] experienced other disturbing or traumatic episodes in his life"); *United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27, 36 (E.D.N.Y. 2011) ("[G]iven the defendant's continuing and long-term affiliation with his gang and the absence of any stable adult figures in his life who could possibly control his behavior, the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from juvenile custody under federal law."); *United States v. C.P.A.*, 572 F. Supp. 2d 1122, 1126-27 (D.N.D. 2008) (finding social background weighed in favor of transfer where juvenile defendant came from "an extremely dysfunctional and unstable family" because likelihood of rehabilitation if returned to that environment was "slim").

In other cases, a mix of positive and negative social influences weighed less strongly in favor of transfer. *See, e.g., United States v. Juvenile Male*, 554 F.3d 456, 469 (4th Cir. 2009) ("With respect to [the defendant's] social background, the record is mixed. The district court found that [the defendant] had been raised in 'a loving and intact family,' and saw nothing in his 'social background that would suggest to [him] that gang activity was acceptable behavior.' In contrast to his family situation, however, [the defendant's] life outside the home was not stable. He joined MS-13 around the age of fourteen, and dropped out of school during the ninth grade when his grades and behavior deteriorated. [The defendant] began abusing alcohol at the age of fifteen or sixteen and started using cocaine and marijuana shortly thereafter. Such behavior indicates a lack of structure and support, and accordingly weighs against his transfer. In these circumstances, the district court did not clearly err in concluding that [the defendant's] social background 'minimally' favored his transfer to adult prosecution.").

Here, however, the Court finds that the defendant's social background weighs in favor of transfer given that the defendant generally had a "stable family life," "there [wa]s no indication that the defendant's family condoned or accepted criminal activity," and he still chose to join MS-13. *Juvenile Male*, 269 F. Supp. 3d at 39 (finding social background favored transfer).

charged, and abstain from examining the strength of the government's evidence. *See, e.g., United States v. Sealed Defendant*, 714 F. App'x 65, 67 (2d Cir. 2018) ("[T]he district court correctly assumed, for purposes of the transfer hearing, that the government's allegations against B.M. are true."); *Nelson I*, 68 F.3d at 589 ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information."). Additionally, as explained above, the Court may weigh this factor more heavily than any other when the alleged offense is particularly serious. *See, e.g., Ramirez*, 297 F.3d at 193 (quoting *Nelson I*, 68 F.3d at 590).

Here, the seriousness of the alleged offenses cannot be overstated. The defendant is charged with four premeditated and brutal murders carried out for MS-13. The defendant allegedly participated in a conspiracy with MS-13 members and associates to murder the victims by luring them to a prearranged location in the woods. As a result of the defendant's alleged conduct, four people were brutally hacked and beaten to death with knives, machetes, and tree limbs.

Defense counsel argues that the "lack of any evidence" that defendant participated in the alleged crimes should be taken into account in weighing the factors. (Def. Mem. at 8.) Defense counsel further asserts that the evidence of the defendant's membership in the gang "is based solely on the word of cooperating defendants." (*Id.* at 5.) In response, the government emphasizes that "a review of the defendant's social media accounts has corroborated the statements of the cooperating defendants by showing that the defendant is Facebook friends with numerous members and associates of the MS-13, including at least seven individuals who committed the April 11 Murders with him." (Gov't Reply at 3.) In any event, as the Court noted above, in deciding transfer motions, courts are to assume that the defendant committed the charged crime. The weight of evidence at this stage, therefore, would not impact the transfer analysis.

Given the obvious severity of the alleged crimes, the Court finds that this factor weighs strongly in favor of transfer, and gives this factor more weight than any other.[10] Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as—or even less serious than—the crimes alleged here. *See e.g., United States v. Wilson*, 149 F.3d 610, 614 (7th Cir. 1998) (district court was "within its discretion to give more weight to the nature of the alleged offense than to the other factors" where defendant was charged with distributing cocaine and crack and had allegedly "brandished a gun and expressed a willingness to use it" in the course of that distribution); *United States v. One Juvenile Male*, 40 F.3d 841, 845-46 (6th Cir. 1994) (district court did not abuse its discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent

---

[10] Defense counsel concedes that "[c]learly, the incident is very serious, and the Court should weigh this factor heavily." (Def. Mem. at 7.) Defense counsel argues, however, that this factor should be "somewhat tempered as applied in this proceeding" in light of the purported lack of evidence. (*Id.*)

11

felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *A.O.*, 2016 WL 4197597, at *7 (nature of alleged offense was most important factor and weighed in favor of transfer where juvenile defendant was charged with the intentional shooting of two people, the reckless shooting of several others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses); *United States v. Doe #1*, 74 F. Supp. 2d 310, 321 (S.D.N.Y. 1999) (although majority of factors weighed against transfer, transfer was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior").

C. Nature and Extent of Any Prior Delinquency Record[11]

Defense counsel states that "[t]here is no evidence of any prior criminal behavior" by the defendant. (Def. Mem. at 7.) The government also states that it "is not aware of any prior criminal history for this defendant in the United States,"[12] and concedes that this factor, thus, weighs against transfer. (Gov't Mem. at 18.) Accordingly, the Court concludes that this factor weighs against transfer. However, the Court notes that the absence of a prior delinquency record does not preclude the transfer of a defendant to adult status when, as in this case, a balancing of all of the statutory factors weighs in favor of transfer. *See, e.g., United States v. Sealed Appellant 1*, 591 F.3d 812, 822 (5th Cir. 2009) (affirming district court's decision to transfer juvenile to adult status despite lack of a prior juvenile record); *Juvenile Male*, 554 F.3d at 468-70 (finding that district court did not err in granting government's transfer motion where the defendant had no prior criminal record and the only factors favoring transfer were the nature of the offense and the defendant's age and social background).

D. Present Intellectual Development and Psychological Maturity

Generally, a juvenile defendant's "present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." *A.O.*, 2016 WL 4197597, at *7 (citing *Juvenile Male*, 844 F. Supp. 2d at 345-46); *see also United States v. A.A.D.*, 106 F. Supp. 3d 272, 277 (D.P.R. 2015) (citing *J.D.*, 525 F. Supp. at 103-04) ("Transfer to adult status is less favored for juveniles who exhibit low intellectual development and stunted psychological maturity because they are viewed as less responsible for their conduct."). As noted above, Dr. Shea conducted a neuropsychological screening of

---

[11] There is a circuit split as to whether this factor is limited to convictions, or encompasses unadjudicated conduct like prior arrests. *Compare Wilson*, 149 F.3d at 613, *with United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Second Circuit has not directly addressed the issue, and this Court need not resolve this question here because there is no indication that the defendant was arrested before his arrest in connection with the April 11 murders.

[12] In its discussion of the defendant's social background, the government noted that it was attempting to obtain records from El Salvador. (Gov't Mem. at 15 n.4.)

the defendant and detailed his findings in a written report. During the examination, Dr. Shea administered a Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") test[13] and a Beta-4 test. The Court has considered Dr. Shea's findings,[14] along with other evidence relating to the defendant's intellectual development and maturity in the parties' submissions, and finds this factor to be neutral.

Based on the WAIS-IV test, Dr. Shea found that the defendant's "overall intellectual functioning" was at the "low average range with a Full-Scale I.Q. score of 84 (14th percentile)." (Shea Rep. at 4.) He noted the defendant's scores on the different components of this test, the lowest of which were his scores on the Processing Speed Index (1st percentile) and the Perceptual Reasoning Index (19th percentile). (*Id.* at 4-5.) On the other hand, the defendant received average scores on the Verbal Comprehension Index (45th percentile) and the Working Memory Index (50th percentile). (*Id.*) On the Beta-4 test of non-verbal intellectual functioning, the defendant's Full-Scale I.Q. of 77 was "in the borderline range at the 6th percentile." (*Id.* at 5.) Based on these tests, Dr. Shea characterized the defendant's "overall functioning" as in the "low average range." (*Id.*) Dr. Shea noted that, despite that overall score, plaintiff "possess[es] relative strengths in common sense reasoning and verbal conceptual reasoning." (*Id.*) He addressed the defendant's "extremely low performance" on Processing Speed, explaining that this metric "affects one's ability to make proper decisions . . . in interpersonal situations, especially those that are new or novel and require an immediacy of response. Thus, when placed in a situation for which he does not have adequate preparation or understanding, he will likely encounter challenges in making spontaneous, thoughtful and/or effective decision[s]." (*Id.*)

With respect to the defendant's psychological maturity, Dr. Shea reported that the defendant "appears physically, emotionally and socially underdeveloped for his age . . . [and] passive and eager to seek acceptance by others." (Shea Rep. at 5.) Dr. Shea also concluded that the defendant's "malleable nature and lack of understanding of US society could make him vulnerable to manipulation by peers." (*Id.*) Dr. Shea suggests that the defendant could mature past this malleable stage; he writes that the defendant "has sufficient intellect to acquit [sic] himself adequately over time . . . [and] personality components that can be nurtured by therapeutic mentorship and enriched compensatory mechanisms." (*Id.* at 6.) LCSW Alfonso made a similar assessment: she found that the defendant "presents younger than his stated age"; his "low average IQ of 84 (according to Dr. Shea) may have contributed to any difficulties he had in his adjustment to the different environment and situations he was confronted with"; and "his pattern of coping with demanding or conflictual situations is to become passive and cooperative." (Alfonso Rep. at 8.)

In contrast with some of Dr. Shea's and LCSW Alfonso's findings indicating that the defendant's intellectual development and maturity were below average, the government argues that "defendant appears to be reasonably intelligent and mature" (Gov't Mem. at 18-19). As the government points out, the Pretrial Services report does not discuss any intellectual or psychological

---

[13] Dr. Shea administered WAIS-IV – Spanish. (Shea Rep. at 4.)

[14] In addition to discussing the results of these tests, Dr. Shea noted at the beginning of his report that the defendant admitted to using marijuana recreationally, but is not prescribed medication, and reported no history of mental illness or psychological treatment. (*Id.* at 2.)

13

deficits, and the defendant reported to Pretrial Services that he successfully completed tenth grade in the United States. (*Id.* at 19.) The defendant's submission also indicates that he was a "fairly good" student in El Salvador (Alfonso Rep. at 3), and is currently receiving As and Bs in the Sojourn High School of the ECJDC (*id.* at 4), undermining the argument that his below-average level of intellectual development weighs against transfer. The Court concludes that the defendant's academic record is probative evidence of the strength of the defendant's intellectual development and maturity level.

Balancing the reports reflecting that the defendant's intellectual development and psychological maturity are below average against indicia suggesting otherwise—in particular, that the defendant is a good student—the Court finds this factor to be neutral. In any event, despite any deficits in intellectual development or psychological maturity, the defendant has the cognitive ability to conform his conduct to the law. *See, e.g., United States v. A.R.*, 203 F.3d 955, 962 (6th Cir. 2000) ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law." (citing *One Juvenile Male*, 40 F.3d at 845)). Accordingly, this factor weighs neither in favor of nor against transfer.[15]

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

There is no evidence that, prior to his detention in connection with the April 11 murders, the defendant ever received any treatment or counseling.

In discussing the defendant's "response to past treatment efforts and the nature of those efforts," defense counsel discusses the defendant's educational program at the ECJDC. The defense argues that the defendant is "adapting and thriving," and is a "model student" who is receiving an average of A in his classes, and whose teachers have noted his "good class participation." (Def. Mem. at 9.) Additionally, defense counsel notes that the defendant "interacts well with his peers and teachers." (*Id.*) However, for the reasons explained above, the Court finds that the defendant's performance at ECJDC, alone, does not establish that the defendant is likely to be rehabilitated if treated as a juvenile. Even so, given that this factor is specifically aimed at the juvenile defendant's response to treatment efforts and that the defendant has thus far responded well to his program at ECJDC, the Court finds that this factor weighs slightly against transfer. *See C.F.*, 225 F. Supp. 3d at 197 (finding this factor weighed strongly against transfer where, among other things, the juvenile "ha[d] not incurred any disciplinary infractions at Sojourn since his juvenile detention ha[d] begun" and had "been commended for peaceful behavior, joined the facility's church group, and responded well to the juvenile setting"); *Doe #1*, 74 F. Supp. 2d at 320 (juvenile's "positive response to the educational and vocational training programs available at Green Correctional Facility" weighed against transfer).

F. Available Programs Designed to Treat the Juvenile's Behavioral Problems

Under this factor, the government bears the burden of establishing a lack of available programs designed to treat the juvenile's

---

[15] The Court notes that, even if this factor weighed against transfer, the Court would still find transfer is warranted after balancing all of the factors.

behavioral problems. *See, e.g., Nelson I*, 68 F.3d at 591. With respect to whether programs would be available to the defendant here if convicted as a juvenile, the government asserts that there are no federal facilities for individuals adjudicated as juveniles. (Gov't Mem. at 20.) Instead, adjudicated juvenile delinquents from this district are sent to state contract facilities for juveniles. (*Id.*) According to the government, there are no contract facilities in New York that would be available to an inmate of the defendant's age. (*Id.*) The government does provide, however, that state contract facilities in Pennsylvania and Maine would potentially be available to the defendant. (*Id.*)[16] The government does not provide any information about treatment programs that would be available to the defendant if adjudicated as an adult.

As noted by the Second Circuit, "[f]or the government to carry its burden of persuasion [on this factor,] it must, of course, do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is some indication that state juvenile facilities in Pennsylvania and Maine might be available to the defendant. Accordingly, the Court finds that the government has not met its burden on this factor and that this factor weighs slightly against transfer. *See United States v. Doe #3*, 113 F. Supp. 2d 604, 609 (S.D.N.Y. 2000) (finding factor weighed against transfer where "the government did no more than 'merely assert the unavailability of an appropriate juvenile rehabilitative program' for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (citing *Nelson I*, 68 F.3d at 591)).[17]

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. The defendant is charged with four murders in connection with his alleged participation in the violent activity of the MS-13 street gang. These are precisely the types of serious, violent crimes that weigh strongly in favor of transfer. In addition to the gravity of the alleged crimes, other factors—including, *inter alia*, the defendant's age at the time of the murders, his decision to join MS-13 despite having been raised by a stable, supportive family, and his academic record suggesting strong intellectual functioning—collectively demonstrate that the defendant is not likely to rehabilitate within the juvenile system if he is convicted of the charged crimes as a juvenile and provided with juvenile rehabilitation programs. Furthermore, as discussed above, the fact that the defendant is over nineteen years old, considered in conjunction with the other factors, strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, 'the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior.'"

---

[16] Accordingly, the government concedes that this factor "may weigh slightly against transfer." (Gov't Mem. at 20.)

[17] Although the Court finds that this factor and the previous factor weigh slightly against transfer, the Court also finds that these factors do not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors overwhelmingly favors transfer.

15

(citations omitted)); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, although some factors favor a denial of the transfer motion, the Court finds that the defendant's rehabilitation potential within the juvenile justice system is low after balancing all of the statutory factors.[18]

As noted above, the Second Circuit has made clear that "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *Nelson II*, 90 F.3d at 640 (quoting *J.D.*, 525 F. Supp. at 103). Accordingly, given that the crimes charged here are extremely violent and the threat to society posed by these crimes is at the highest level, and given that the overall record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

## IV. CONCLUSION

For the reasons explained above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

S/ Joseph F. Bianco
JOSEPH F. BIANCO
United States District Judge

Dated: June 19, 2018
Central Islip, New York

---

[18] The Court has carefully considered the defendant's experts' analyses, but finds them inadequate to support the conclusion that the defendant is likely to be rehabilitated in the juvenile justice system. For example, in analyzing the defendant's prospects of rehabilitation, the experts fail to assume (as the case authority suggests the Court must) that the defendant participated in the alleged violent murders; rather, the experts simply appear to assume that he did not commit the alleged crimes. (*See, e.g.*, Alfonso Rep. at 8 ("His history does not indicate that aggressive and violent behavior is a way in which he would handle stressful situations."); Shea Rep. at 5 ("[I]t is unlikely that he would purposefully join a group that would foster and popularize the very type of trauma that threatened his life and killed his uncle.").) Moreover, although the reports suggest the defendant can be rehabilitated, they do not adequately address what the likelihood is that such rehabilitation would be achieved in the timeframe that the defendant would spend in the juvenile justice system if he were not transferred to adult status. (*See, e.g.*, Shea Rep. at 6 ("[The defendant] has sufficient intellect to acquit [sic] himself adequately over time as well as the expressed desire to succeed academically. He also possesses personality components that can be nurtured by therapeutic mentorship and enriched compensatory mechanisms. By having such, it will allow him to transition to a more productive and secure life.").) In short, notwithstanding the explanations by the defendant's experts regarding the defendant's personality traits and positive qualities, the Court concludes, based upon an analysis of all of the factors (including the nature of the alleged offenses) that the defendant is unlikely to be rehabilitated within the juvenile justice system.

\* \* \*

The United States is represented by Richard P. Donoghue, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722, by John J. Durham, Raymond A. Tierney, Paul G. Scotti, and Michael T. Keilty, Assistant U.S. Attorneys. Defendant Juvenile Male is represented by Gerald J. DiChiara, Law Offices of Gerald J. DiChiara, 3 Park Avenue, 31st Floor, Suite 1501, New York, New York 10016.